# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

TANA KING,

        Plaintiff,

vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

        Defendant.

No. C13-3039-LTS

**MEMORANDUM OPINION
AND ORDER**

---

Plaintiff Tana King seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for Supplemental Security Income benefits (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* (Act). King contends that the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that she was not disabled during the relevant period of time. For the reasons that follow, the Commissioner's decision will be reversed and remanded for further proceedings.

## I.    BACKGROUND

King was born in 1969 and previously worked as a fast food worker, cashier, dining room attendant and short order cook. AR 304, 354. She initially filed for SSI on July 26, 2005, claiming disability due to polysubstance abuse, major depressive disorder, bipolar disorder, post-traumatic stress disorder, personality disorder, hypertension, chronic obstructive pulmonary disease, headaches, hepatitis C and poor dentition. AR 46, 48. Her claim was denied initially and on reconsideration. AR 72-79. She then requested a hearing before an Administrative Law Judge (ALJ), which was

held on October 3, 2007. AR 1256-75. On November 30, 2007, ALJ Gary Shelton issued a decision denying King's claim. AR 43-52. On April 2, 2010, the Appeals Council vacated the decision and remanded King's claim to obtain additional evidence and associate King's subsequent Title XVI application dated December 8, 2009. AR 98-101. ALJ Jo Ann Draper held hearings on September 7, 2010, and October 19, 2010. AR 1276-1337. She then issued a decision on November 23, 2010, denying King's claim. AR 54-64. On May 3, 2012, the Appeals Council again vacated the decision and remanded King's claim to obtain additional evidence and consider the associated claims. AR 65-69. ALJ Draper held a hearing on December 6, 2012, during which King and a vocational expert (VE) testified. AR 1338-63. The ALJ then issued a decision on April 22, 2013, finding King had not been disabled from July 26, 2005, through the date of the decision. AR 18-39. King sought review of this decision by the Appeals Council and it denied review on June 25, 2013. AR 9-11. The ALJ's decision thus became the final decision of the Commissioner. AR 1; 20 C.F.R. § 416.1481.

On August 13, 2013, King filed a complaint (Doc. No. 6) in this court seeking review of the Commissioner's decision. On September 10, 2013, with the parties' consent (Doc. No. 9), the Honorable Mark W. Bennett transferred this case to me for final disposition and entry of judgment. The parties have briefed the issues and the matter is now fully submitted.

## II.     *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience,

engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that

the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### III. ALJ'S FINDINGS

The ALJ made the following findings in the most recent decision:

(1)  The claimant has not engaged in substantial gainful activity since July 26, 2005, the application date (20 CFR 416.971 *et seq.*).

(2)  The claimant has the following severe impairments: bipolar disorder; posttraumatic stress disorder (PTSD); personality disorder; chronic obstructive pulmonary disease (COPD) and emphysema; borderline intellectual functioning; hepatitis C; degenerative disc disease of the cervical spine (20 CFR 416.920(c)).

(3)  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

(4)  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she could only handle and finger bilaterally on an occasional basis. She should have no more than occasional exposure to extreme

heat, cold, and humidity. She should have no exposure to pulmonary irritants such as fumes, odors, dusts, and gases. She would be limited to tasks that could be learned in thirty days or less involving no more than simple work-related decisions with only occasional workplace changes. She should have no more than occasional interaction with the public or coworkers.

(5)     The claimant is unable to perform any past relevant work (20 CFR 416.965).

(6)     The claimant was born on May 7, 1969 and was 36 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

(7)     The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

(8)     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

(9)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 415.969 and 416.969(a)).

(10)    The claimant has not been under a disability, as defined in the Social Security Act, since July 26, 2005, the date the application was filed (20 CFR 416.920(g)).

AR 21-39.


## IV.     THE SUBSTANTIAL EVIDENCE STANDARD

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial

evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817,

822 (8th Cir. 1992)).  The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## V.    DISCUSSION

King argues the ALJ's decision is not supported by substantial evidence because the ALJ erred in evaluating the medical opinions by (a) relying on the opinion of an unacceptable medical source regarding King's physical impairments and (b) giving greater weight to the opinions of consultative examiners than to the findings of King's treating psychiatrist.  She also argues the ALJ erred by discrediting her based on her noncompliance with treatment without considering whether noncompliance was a symptom of her mental impairments.  I will discuss these arguments separately below.

### A.    *Evaluation of Medical Opinions*

### 1.    *Pamela Claussen, RN*

King argues the ALJ erred by relying on the opinion of Pamela Claussen, RN, to discredit King's subjective complaints related to her physical impairments.  Claussen performed a consultative physical examination in May 2010.  AR 1090-95.  King argues Claussen is not an acceptable medical source under the regulations and the ALJ cannot rely on her opinion regarding the presence (or absence) of physical impairments.  She contends the ALJ should have analyzed Claussen's opinion according to Social Security Ruling (SSR) 06-3p.  The Commissioner argues the ALJ properly considered Claussen's opinion in evaluating King's physical impairments and her credibility.

Generally, the opinion of a one-time consultative examiner does not constitute substantial evidence, especially when contradicted by a treating physician's opinion.

8

*Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000). Moreover, a registered nurse (or "RN") is not an "acceptable medical source." *See* 20 C.F.R. § 416.913(a).[1] SSR 06-03p nonetheless requires the ALJ to give consideration to a RN's opinion. That ruling includes the following statements:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. *See* 20 CFR 404.1513(a) and 416.913(a). Second, only "acceptable medical sources" can give us medical opinions. *See* 20 CFR 404.1527(a)(2) and 416.927(a)(2). Third, only "acceptable medical sources" can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. *See* 20 CFR 404.1527(d) and 416.927(d).

> * * *

> In addition to evidence from "acceptable medical sources," we may use evidence from "other sources," as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to:

> - Medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists;

> * * *

> Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the

---

[1] These regulations list "acceptable medical sources" who can "provide evidence to establish an impairment." Registered nurses are not on the list.

consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity.

* * *

Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.

Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because, as we previously indicated in the preamble to our regulations at 65 FR 34955, dated June 1, 2000, "acceptable medical sources" "are the most qualified health care professionals." However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

*See* SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).  Among other things, this ruling means a RN's opinion (a) is not entitled to controlling weight and (b) cannot establish the existence of a medically-determinable impairment.  However, a RN's opinion <u>can</u> be used as evidence of the severity of an impairment and how the impairment affects the

individual's ability to function. An ALJ must evaluate the RN's opinion with reference to the same factors that apply to other medical sources, including:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s), and
- Any other factors that tend to support or refute the opinion.

*See* 20 C.F.R. § 416.927(d).

King saw Claussen in May 2010 for a consultative evaluation and Claussen made the following conclusions following her examination on King's physical limitations:

> Ms. King has no significant physical basis for disability. Despite her c/o there are no significant abnormal findings on exam, not even apprehension w/ range of motion testing. There are no neurological complaints or findings at this time. Her pulmonary statis is not sufficiently impaired to preclude physical labor, and besides, it's self imposed. Except possibly for deconditioning, she should have no physical trouble w/ sit/ stand/ walk in an 8 hour work day. Lift and carry should not be a problem w/ limits proportional to her body size. Bend, twist and squat should not be a problem after a suitable break in period. Use of upper extremities, communication, special senses and travel should not be a problem. She can manage funds on her own behalf.

AR 1093.

The ALJ discussed Claussen's findings in two separate areas of her opinion. First, she discussed it in her evaluation of the medical evidence. AR 27. The ALJ summarized Claussen's findings and noted they were from an "examining, non-treating, 'other' source." *Id.* She stated that while they appeared consistent with those of King's treating physicians during the relevant time period, subsequent treatment notes indicated that King

11

would be further limited than Claussen had suggested. *Id.* She gave Claussen's opinion "some weight." *Id.* The ALJ also discussed Claussen's opinion in her credibility analysis, which is where King alleges error. The ALJ discredited Claussen's allegations of disabling back and neck pain symptoms. AR 35-36. She reasoned that King's allegations were inconsistent with physical examination and MRI findings in 2003 when King first alleged she was disabled. AR 35. In June 2006, King only complained of pain related to a toothache. The ALJ noted there were significant gaps in treatment from June 2006 through April 2007, with normal physical examination findings and no complaints of cervical pain. AR 36. She received minimal treatment from 2007 through February 2008, and did not report any cervical pain symptoms. Again, physical examination findings were normal. *Id.* King had reported her neck pain symptoms were well-controlled with medications when she was evaluated by a nurse practitioner in September 2009. *Id.* The ALJ then noted that Claussen's consultative examination findings in May 2010 indicated King had "no significant basis for disability." *Id.* She noted a significant gap in treatment from April 2011 until June 2012, and physical examination findings in June 2012 revealed only decreased cervical spine range of motion and tenderness. *Id.* Otherwise, King had normal gait, normal upper and lower extremity range of motion and strength and normal foot evaluations. The ALJ concluded that these significant inconsistencies eroded the credibility of King's allegations.

I find that the ALJ appropriately considered Claussen's opinion in accordance with the regulations and her evaluation of that opinion is supported by substantial evidence. The ALJ did not give it controlling weight and it was not used to establish the existence of a medically-determinable impairment. The ALJ did use the opinion to evaluate the severity of King's physical impairments and how those impairments affect her ability to function. *Id.* This is consistent with SSR 06-03p. Moreover, Claussen's opinion was not used as the sole basis to discredit the severity of King's physical impairments. She considered it in the timeline of medical evidence and treatment related to King's physical impairments and appropriately found that it did not support King's allegations of disabling

physical limitations at that time. The ALJ's evaluation of Claussen's opinion in the course of assessing King's credibility is supported by substantial evidence.

However, Claussen's opinion does <u>not</u> constitute substantial evidence to uphold the ALJ's burden at Step Five of showing King has the RFC to perform work available in significant numbers in the national economy. At Step Five, the Commissioner must show (a) that the claimant's RFC will allow the claimant to make an adjustment to other work and (b) that the other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591; *see also* 20 C.F.R. § 416.920(a)(4)(v). Here, substantial evidence does not support the ALJ's finding that King has the RFC to make an adjustment to other work, as there is no medical evidence from any treating or examining source concerning the work-related limitations associated with King's physical impairments.

This finding is based on *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000), a case in which the Commissioner made a Step Five determination that a claimant who could not perform past relevant work could, nonetheless, perform various jobs identified by a VE. *Id.* at 857. In *Nevland*, the claimant's RFC was based on the opinions of non-treating and non-examining physicians who reviewed the claimant's records. *Id.* at 858. The Eighth Circuit Court of Appeals found this was insufficient and stated:

> In our circuit it is well settled law that once a claimant demonstrates that he or she is unable to do past relevant work, the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do. *McCoy v. Schweiker*, 683 F.2d 1138, 1146–47 (8th Cir. 1982)(en banc); *O'Leary v. Schweiker*, 710 F.2d 1334, 1338 (8th Cir. 1983). It is also well settled law that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

*Id.* at 857. The court then noted that while the record contained many treatment notes, none of the treating physicians provided opinions concerning the claimant's RFC. *Id.* at 858. The court then stated:

In the case at bar, there is no *medical* evidence about how Nevland's impairments affect his ability to function now. The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of Nevland's RFC. In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole. *Jenkins v. Apfel,* 196 F.3d 922, 925 (8th Cir.1999). Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. *Id.* In our opinion, the ALJ should have sought such an opinion from Nevland's treating physicians or, in the alternative, ordered consultative examinations, including psychiatric and/or psychological evaluations to assess Nevland's mental and physical residual functional capacity. As this Court said in *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir.1975): "An administrative law judge may not draw upon his own inferences from medical reports. *See Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir.1974); *Willem v. Richardson*, 490 F.2d 1247, 1248–49 n. 3 (8th Cir.1974)."

*Id.* [emphasis in original].

In this case, the record contains no medical opinions, whether from treating or examining sources or otherwise, concerning King's physical impairments. The only opinion addressing work-related limitations that result from her physical impairments comes from Claussen. As discussed above, Claussen is not an acceptable medical source and therefore cannot provide a medical opinion. In addition, the ALJ found that King's subsequent treatment notes show that she is more limited than Claussen suggested. AR 27. Those subsequent treatment notes contain objective medical findings but no medical opinions as to King's physical work-related limitations.[2] This suggests the ALJ made her

---

[2] The ALJ noted King's treating nurse practitioner had provided a medical source statement. AR 29. A nurse practitioner is not an acceptable medical source and, therefore, cannot provide a medical opinion. *See, e.g.*, SSR 06-03p. Moreover, the nurse practitioner's opinion simply states that King was unable to work (AR 1246), which is a finding reserved for the Commissioner. *See House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.").

own inferences about King's physical work-related limitations based on the objective medical evidence and King's own allegations, which is improper. *See Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975) ("An administrative law judge may not draw upon his own inferences from medical reports."). This case must be remanded for further proceedings to obtain a medical opinion from a treating or examining source as to the work-related limitations that arise from King's physical impairments. I will address King's other arguments to determine if there are other issues to address on remand.

### 2.    *Treating Physicians and Consultative Examiners*

King argues that the ALJ erred in evaluating her mental impairments by relying on opinions of consultative psychological examiners rather than findings made by her most-recent treating psychiatrist. She contends the consultative examiners' opinions are inconsistent with the findings and treatment of Dr. Bernhagen, her treating psychiatrist. Specifically, she points out that Dr. Bernhagen assigned her a Global Assessment of Functioning (GAF) score of 50.[3]

The Commissioner argues the ALJ gave appropriate weight to the opinions of the consultative examiners and Dr. Bernhagen. She contends the consultative examiners' opinions are consistent with Dr. Bernhagen's treatment notes and a GAF score of 50 is not *per se* disabling.

As stated above, the opinion of a one-time consultative examiner generally does not constitute substantial evidence, especially when contradicted by a treating physician's opinion. *Cantrell*, 231 F.3d at 1107. "A treating physician's opinion is given controlling

---

[3] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM-IV). A GAF score of 41 to 50 indicates the individual has serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or a serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Id.*

weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *House v. Astrue*, 500 F.3d 741, 744 (8th Cir. 2007) (quoting *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005)). It is the ALJ's duty to assess opinions and determine the weight to be given these opinions. *See Finch*, 547 F.3d at 936 ("The ALJ is charged with the responsibility of resolving conflicts among medical opinions."); *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) ("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'") (citing *Bentley v. Shalala*, 52 F.3d 784, 785-87 (8th Cir. 1995)).

Suzanne Throesch, Psy.D., provided a consultative psychological evaluation in January 2006. AR 489-91. Dr. Throesch noted that King described her mood as depressed and anxious. AR 489. She reported a long history of extreme mood swings and would become tearful when she spoke about her son who had died six months ago in a motor vehicle accident. *Id.* Dr. Throesch stated it was clear that King was still grieving from this event. She assigned King a GAF score of 50 and noted that her grief over the loss of her teenage son was complicating her preexisting mood disorder and increasing her anxiety. AR 490. She found King was able to communicate effectively. As for her social capabilities, she noted King had told her she had trouble talking to people and felt out of place everywhere she went. AR 491. She also noted a history of aggressiveness and possible chemical and emotional dependency and impulsiveness. *Id.* With the exception of mild difficulty concentrating on serial threes, she found no problems in concentration, persistence and pace. *Id.*

The ALJ summarized Dr. Throesch's findings and noted they were generally consistent with the objective mental status findings of record. She gave them some weight. AR 31. She also stated they were generally consistent with King's subsequent psychiatric treatment notes and her later consultative psychological evaluation. *Id.*

William Morton, Psy.D., performed a consultative psychological evaluation in May 2010. AR 1111-13. He assigned a GAF score of 55 and provided the following summary:

> It appears that Ms. King is able to adequately self-care and attend to the activities of daily living. She can adequately manage her own finances and thus could handle cash benefits should she receive them. It appears that there are minimal mental limitations in regard to remembering and understanding instructions, procedures, and locations. There are mild mental limitations in regard to carrying out instructions. There are minimal mental limitations in regard to maintaining attention, concentration, and pace. There are moderate mental limitations in regard to interacting appropriately with supervisors, co-workers, and the public. There are mild mental limitations in regard to using good judgment and responding appropriately to changes in the work place.

AR 1113.

The ALJ summarized Dr. Morton's findings and gave his opinion significant weight. AR 32-33. She noted his opinion was generally consistent with the mental status examination performed by King's treating psychiatrist, Dr. Bernhagen. She stated Dr. Bernhagen's treatment notes indicated that King's symptoms were controlled while regularly following up and taking prescribed medications. AR 33. The ALJ also found Dr. Morton's conclusions were generally consistent with Dr. Throesch's. *Id.*

King began seeing Dr. Bernhagen in March 2011. AR 1179-81. She stated she had recently moved to Iowa from Arkansas and needed to get back on her medication after being off of it while she was pregnant. AR 1179. Dr. Bernhagen diagnosed her with bipolar disorder, type I, and generalized anxiety disorder. *Id.* He noted her psychosocial stressors were moderate to severe and assigned a GAF score of 50. AR 1181. He also resumed the medication she had been taking prior to her pregnancy. *Id.* A few weeks later, King saw Dr. Bernhagen again and stated her medication had been very helpful and she felt more like herself. AR 1178. In May 2011, King indicated the

17

medication continued to work well and helped stabilize her moods. AR 1202. In June 2011, King reported she still had sleep difficulties but was otherwise doing well. AR 1200. King returned to Arkansas for a few months, but then came back to Iowa and saw Kyle McCard, ACSW, LISW, in September 2012. AR 1252-54. King told McCard her previous medication had too many negative side effects and she quit taking it. AR 1252. He assessed a GAF score of 50. *Id.* King saw Dr. Bernhagen in October 2012 and he prescribed medication. AR 1249. The ALJ summarized Dr. Bernhagen's and McCard's treatment notes. AR 33-34. Because neither of them provided a medical opinion, the ALJ did not assign any weight to that evidence.

King argues Dr. Throesch and Dr. Morton's opinions are inconsistent with Dr. Bernhagen's findings and treatment notes because Dr. Bernhagen assigned King GAF scores of 50, which the ALJ failed to acknowledge. A GAF score of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). DSM-IV at 34. The Eighth Circuit Court of Appeals has recognized that GAF scores below 50 can demonstrate moderate to complete impairment in work-related skills. *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009). In *Pate-Fires*, the claimant's GAF scores ranged from 10 to 58 with scores above 50 only four out of twenty-one times in a six-year period. *Id.* at 944. The court noted that the history of GAF scores at 50 or below, taken as a whole, indicated the claimant had serious symptoms and/or impairments in social, occupational or school functioning, which the ALJ failed to discuss. *Id.* The court found that this evidence supported the claimant's treating physician's opinion that she was not capable of participating in gainful employment. *Id.* Despite the significance of the GAF scores in that case, the Eighth Circuit has held that GAF scores are not essential to the accuracy of a RFC determination, but may be of considerable use in formulating the RFC. *Earnheart v. Astrue*, 484 F. App'x 73, 75 (8th Cir. 2012).

Dr. Bernhagen and McCard assigned King a GAF score of 50 on three separate occasions. AR 1181, 1185, 1254. Rhonda Wykoff, RN, LMHC, who works at the same clinic, assigned a GAF score of 45 on October 9, 2012. AR 1250. These scores do not reflect the long history of low GAF scores that was present in *Pate-Fires*. King's scores span a two-year time period and were provided only (a) during her initial evaluation when she had been off her medication following her pregnancy and (b) when she returned to the provider after a six-to-seven month break from treatment and medication while she lived in another state. AR 1249, 1252-54. The sporadic and brief treatment by these providers greatly reduces the significance of these GAF scores in assessing King's RFC.

Moreover, the Social Security Administration has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements in our mental disorders listings." *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed Reg. 50,746, 50,764-65, 2000 WL 1173632 (August 21, 2000).[4] Thus, while GAF scores are relevant and should be considered, they are "not essential to the accuracy of an RFC determination." *Earnheart*, 484 F. App'x at 75 (citing *Halverson v. Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010)). The ALJ demonstrated she had considered McCard's and Dr. Bernhagen's treatment notes by summarizing them in her decision. She was not required to specifically discuss the GAF scores. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.").

I find that the ALJ did not err in evaluating the opinions of the consultative examiners and Dr. Bernhagen's treatment notes. The consultative examiners noted

---

[4] The Commissioner points out that the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"), released in May 2013, no longer uses GAF scores to rate an individual's level of functioning. *See Rayford v. Shinseki*, No. 12-0042, 2013 WL 3153981, at *1 n.2 (Vet. App. June 20, 2013) (citing DSM-V 16 (5th ed. 2013)). Use of the GAF scale was abandoned because of, *inter alia*, "its conceptual lack of clarity" and "questionable psychometrics in routine practice." *Id.*

King's mood was depressed and anxious and she had a long history of mood swings. She also reported poor sleep, appetite and energy levels. These symptoms are consistent with her reports to Dr. Bernhagen. AR 1200, 1202, 1204, 1206-07, 1249. Mental status examinations by the consultative examiners revealed she was alert and oriented, had adequate comprehension, normal attention and concentration, logical and coherent thought processes and little to no difficulty with serial calculations and memory testing. AR 489-91, 1112-13. These findings are consistent with Dr. Bernhagen's notes which indicate she was alert and oriented, maintained attention during appointments, had a goal-directed thought process and her sensorium and cognition were grossly intact. AR 1200, 1202, 1204, 1206-07, 1249. Although Dr. Bernhagen's GAF scores of 50 indicate more serious limitations than the mild to moderate limitations identified by Dr. Morton, this can be explained by King's noncompliance with medication at the time Dr. Bernhagen provided those scores.

To the extent King argues Dr. Bernhagen's GAF score of 50 is entitled to more weight than the opinions of the consultative examiners, I disagree. A GAF score is not a medical opinion and the consultative examiners' medical opinions are supported by more thorough medical evidence. *See* 20 C.F.R. § 416.927(a)(2) (defining medical opinions as statements "that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions."); *Prosch v. Apfel*, 201 F.3d 1010, 1014 (8th Cir. 2000) ("[A]n ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence."). For these reasons, I find the ALJ's evaluation of the consultative examiners' opinions and Dr. Bernhagen's treatment notes is supported by substantial evidence in the record as a whole. The ALJ is not required to re-evaluate this aspect of her decision on remand.

**B.** *Credibility Determination*

King also attacks the ALJ's credibility determination by arguing she should not have discredited her based on noncompliance with treatment without considering whether noncompliance is a symptom of her mental impairments. She cites *Pate-Fires* in which the court noted that a mentally ill person's noncompliance with medication can be the result of the mental impairment itself and therefore may not be willful or without justifiable excuse. *See Pate-Fires*, 564 F.3d at 945. The Commissioner contends there is nothing in the record to suggest that King's noncompliance or failure to seek treatment was the result of an impairment. She argues the ALJ provided good reasons for discrediting King's allegations of disability that are supported by substantial evidence.

The standard for evaluating the credibility of a claimant's subjective complaints is set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ must consider the claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *Polaski*, 739 F.2d at 1322. The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000). The ALJ does not need to explicitly discuss each factor as long as he or she acknowledges and considers the factors before discrediting the claimant's subjective complaints. *Goff*, 421 F.3d at 791. "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh*, 222 F.3d at 452. The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnart*, 393 F.3d 798, 801 (8th Cir. 2005).

King's failure to seek regular treatment and her noncompliance with treatment were only two out of many reasons the ALJ found King's allegations were not fully credible. After listing the *Polaski* factors, the ALJ first noted that the objective medical

evidence did not support King's allegations of disabling symptoms and limitations. AR 35. Part of this reasoning was based on King's infrequent treatment for her pain symptoms and the significant gaps in her treatment history. AR 35-36. It was also based on normal physical examination and MRI findings and evidence that King did not complain of certain symptoms during the period she alleged she suffered those disabling symptoms. *Id.* The ALJ found these inconsistencies eroded the credibility of King's allegations.

Next, the ALJ noted King's noncompliance with her medications and her failure to follow up as suggested made her allegations less credible. AR 36. She did not direct this reason to any particular impairment, but in the same paragraph she discussed King's emphysema, noting that it was considered mild, with "good control medically." *Id.* She also stated King had recently denied any breathing related problems.

The ALJ then discussed King's allegations regarding her mental impairments. *Id.* She noted the significant gaps in her treatment and the fact that King's symptoms were well controlled when she was compliant with her medications. *Id.* In discussing her activities of daily living, the ALJ remarked that King cared for two young infants with some assistance from her boyfriend. *Id.* She had no problem performing personal care tasks and preparing meals on a daily basis and could perform household chores with some breaks. *Id.* She would go out alone on a daily basis and would shop for groceries, household supplies and clothes once or twice a month. *Id.* She did not need assistance with taking her medication, exercising, sleeping, preparing meals and participating in household chores. Her hobbies included playing with her children, fishing and grilling outside. She did not spend time with people other than her children and boyfriend and would speak to her family by phone.

King alleged that her concentration, attention and pace varied, but the ALJ noted the consultative examiner found they were within normal limits. *Id.* She did not have any problems with concentration during her psychiatric evaluations. King reported she could follow written and spoken instructions "okay," but would sometimes need spoken

instructions repeated. *Id.* She had difficulties handling stress and changes in routine. Her memory during objective testing was intact. The ALJ found King was capable of performing work activity consistent with the RFC. AR 37.

I find that the ALJ's credibility determination is supported by substantial evidence in the record as a whole. In some cases involving mental impairments, it is error for the ALJ to discredit a claimant based on noncompliance with treatment or failure to regularly seek treatment without considering whether those things are a part of the mental impairment itself. *See Pate-Fires*, 564 F.3d at 945. Here, the ALJ discredited King based, in part, on noncompliance with medications and significant gaps in treatment and did not consider whether these things were related to King's mental impairments. However, I find this is not reversible error. King reported she did not need assistance with regard to taking her medications during her consultative examination, which the ALJ acknowledged. AR 36, 1111. Even if there is some evidence in the record to support a finding that King's noncompliance with treatment and failure to regularly seek treatment was related to her mental impairment, I find that it would not change the outcome of the ALJ's decision. These were only two of many reasons that were used to discredit King's subjective allegations and my role is not to reweigh the evidence presented to the ALJ. *See Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007) ("If substantial evidence supports the ALJ's decision, we will not reverse it merely because substantial evidence would have supported a contrary outcome or because we might have decided the case differently in the first instance."). Because the ALJ's credibility determination is supported by substantial evidence, she is not required to re-evaluate this aspect of her decision on remand unless she finds it necessary based on the new medical opinion evidence addressing King's physical work-related limitations.

## CONCLUSION

For the reasons set forth herein, the Commissioner's determination that King is not disabled is **reversed** and this case is **remanded** to the Commissioner for further

proceedings. Given the long history of this claim, the proceedings on remand should be expedited to the extent possible. Judgment shall be entered in favor of the plaintiff and against the defendant.

On remand, the ALJ must obtain medical opinion evidence, either from a treating source or a consultative examiner, concerning the work-related limitations that result from King's physical impairments. The treating physician or consultative examiner should be asked to review the medical evidence to determine the onset date of these limitations, as subsequent SSI applications have been associated with King's original application, filed on July 26, 2005. The ALJ must then re-evaluate King's RFC based on the new evidence and the record as a whole. If this process results in amended findings concerning King's RFC, it may be necessary for the ALJ to obtain additional VE testimony in order to decide King's claim.

**IT IS SO ORDERED.**

**DATED** this 4th day of April, 2014.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE